IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KEYONNA WILLIAMS,                              CV 07-1860-MA

        Plaintiff,                             OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

        Defendant.

H. PETER EVANS
9900 S.W. Greenburg Road
Columbia Business Center, Suite 235
Portland, OR 97223
(503) 245-6309

        Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
BRITANNIA I. HOBBS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1158

1 - OPINION AND ORDER

THOMAS M. ELSBERRY
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2112

        Attorneys for Defendant

MARSH, Judge.

    Plaintiff Keyonna Williams seeks judicial review of a final decision of the Commissioner denying her March 10, 2004, application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and her February 19, 2004, application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f.

    Plaintiff alleges she has been disabled since May 1, 2003, because of bladder problems, depression, anxiety, and paranoia. Plaintiff's disability claim was denied initially and on reconsideration.  The Administrative Law Judge (ALJ) held a hearing on July 25, 2006, at which plaintiff and a vocational expert testified.  On February 23, 2007, the ALJ issued a decision that plaintiff was not disabled.  On November 15, 2007, the Appeals Council denied plaintiff's request for further review.  The ALJ's decision, therefore, was the Commissioner's final decision for purposes of judicial review.

Plaintiff seeks an Order from this court reversing the Commissioner's final decision and remanding the case for supplemental proceedings with directions to the ALJ to order neuropsychological and alcohol/drug evaluations.  For the following reasons, I **AFFIRM** the final decision of the Commissioner and **DISMISS** this action.

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  Bowen v. Yuckert, 482 U.S.137, 140 (1987).  See also 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability on May 1, 2003.

At Step Two, the ALJ found plaintiff suffers from severe impairments of adjustment disorder and history of drug and alcohol abuse under 20 C.F.R. §§ 404.1520(c) and 416.920(c) (an impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found these impairments do not meet

3 - OPINION AND ORDER

or equal listed impairments.  20 C.F.R. § 404.1520(a)(4)(iii) and
(d), and § 416.920 (a)(4)(iii) and (d).  The ALJ found plaintiff
has the residual functional capacity to work with no physical
limitations, but she is limited to performing simple tasks that
do not involve extensive social interaction.

At Step Four, the ALJ found plaintiff is able to perform her
past relevant work as a receptionist, personal attendant, general
office clerk, cashier, warehouse laborer, and care provider.
In the alternative, plaintiff can also perform the jobs of house-
keeper/cleaner and bean-sprout nursery laborer.

Consistent with the above findings, the ALJ found plaintiff
was not under a disability and denied both of her applications
for benefits.

### LEGAL STANDARDS

The initial burden of proof rests on the claimant to
establish disability.  Roberts v. Shalala, 66 F.3d 179, 182
(9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet
this burden, the claimant must demonstrate the inability "to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which . . .
has lasted or can be expected to last for a continuous period of
not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The district court must affirm the Commissioner's decision
if it is based on proper legal standards and the findings are

supported by substantial evidence in the record as a whole.
42 U.S.C. § 405(g).  "Substantial evidence means more than a mere
scintilla but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.
1995).

The court must weigh all of the evidence whether it supports
or detracts from the Commissioner's decision.  Martinez v.
Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's
decision must be upheld, however, even if the "evidence is
susceptible to more than one rational interpretation."  Andrews,
53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record.
DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  The
duty to further develop the record, however, is triggered only
when there is ambiguous evidence or when the record is inadequate
to allow for proper evaluation of the evidence.  Mayes v.
Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).  One of the
means available to an ALJ to supplement an inadequate medical
record is to order a consultative examination, i.e., a physical
or mental examination or test purchased for [a claimant] at
[the Social Security Administration's] request and expense.
20 C.F.R. §§ 404.1519, 416.919.  Reed v. Massinari, 270 F.3d 838,
841 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert. denied, 121 S. Ct. 628 (2000).  "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded."  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).

## ISSUES ON REVIEW

Plaintiff contends the ALJ erred in failing to (1) develop the record by ordering neuropsychological or alcohol/drug evaluations (2) adequately assess whether plaintiff can work eight hours a day, five days a week, (3) perform a functional analysis of plaintiff's past relevant work; and (4) give an adequate hypothetical to the vocational expert (VE).

## PLAINTIFF'S TESTIMONY/EVIDENCE

The following evidence is drawn from plaintiff's hearing testimony, disability application, and work and earnings history reports.

Plaintiff was 27 years old on the date of the hearing before the ALJ.  She was born in Portland, Oregon, and has a 10th-11th grade education.  She attempted to but did not complete some community college classes.  As of the hearing date, plaintiff had a three-year-old daughter and a three-month old son.

After high school, plaintiff obtained a certificate after completing a construction trade school.

Plaintiff last worked as a part-time cashier at K-Mart. She was terminated because she was unable to perform the job adequately.  Plaintiff cannot remember some of her other jobs. In 2005, she worked as a filing clerk but was fired after several weeks when she experienced anxiety attacks.  She worked full-time as a receptionist for a "temp" service from January to May 2003. She was also terminated from that job because she was unable to perform the work and was unable to establish an "employer relationship."  In 2001, plaintiff worked full-time for several months as a receptionist at OHSU, but was let go for reasons she does not remember.  She also worked as a care-giver for an elderly lady, but that job ended when the lady passed away.

When plaintiff was working, she was stressed, depressed, and overwhelmed.

Plaintiff's drivers license is suspended because she had too many tickets.  She has convictions in 2004-2005 for unlawful use of a motor vehicle and theft.

Plaintiff states she has been disabled since May 2003, after the premature birth of her daughter.  Her health has been getting worse since then.  She stopped taking medications because she thought she was getting better.  She was hospitalized for several days for the birth of her son by caesarian section.

7 - OPINION AND ORDER

On several occasions, she has been hospitalized overnight after she complained of anxiety attacks.  She was advised to get psychological treatment but failed to attend mental health treatment sessions because she had "a hard time getting out of the house just to get to the appointments."

Plaintiff does not get along with other people.  She has difficulty sleeping more than four-six hours each night.  She spends the majority of the day "[j]ust kinda sleepin' things away"  Plaintiff's sister helps her with childcare, personal grooming and bathing, and does plaintiff's housecleaning, grocery shopping, and most of the cooking.  She also pays the bills.  Plaintiff does her own laundry about once a month.

Plaintiff tries to get some walking exercise everyday, limited to going outside, getting some fresh air, and returning to the house.  She walks less than a block because of back and leg pain.

Plaintiff states she told a social services caseworker that she was the victim of domestic violence, which enabled her to obtain money.  She later denied being a victim when she thought her daughter would be removed from the home.  She also denied any mental health problems in order to retain custody of her daughter.  She lost custody of her daughter for several months in 2004 because of her inability to care for the child.

Plaintiff denies excessive drinking, stating her last drink before the hearing was a couple of glasses of wine two months earlier. She also denied any use of illegal drugs since she was a teenager and last smoked marijuana a "couple of years" earlier. Plaintiff denied telling a consulting doctor in October 2004, and a mental health and addiction counselor in February 2005, that she was using marijuana at the time. She states she had smoked marijuana 10-20 times as a teenager but not since then. Later in her testimony, she stated her marijuana use "was not a consistent thing . . ., maybe a couple of times every couple months." She smokes about 10 cigarettes daily.

Plaintiff takes Lexapro to treat her anxiety and Vicodin twice daily to control migraine headaches, which occur at least once a day and sometimes two-three times a day. The headaches last from five minutes to three hours and are so severe that plaintiff cannot lift her head. A neurologist examined her for her migraines sometime in 2005 and advised her to stay relaxed and take prescribed medication, i.e., Vicodin. Plaintiff describes her pain level with medication as 7 on a 1-10 scale, and as 10 without it.

## MEDICAL TREATMENT EVIDENCE

The medical record includes treatment records relating to plaintiff's pregnancies and other medical issues that are not relevant to the court's review. Plaintiff was prescribed

9 - OPINION AND ORDER

medication for post-partum depression.  Drug screening tests during the pregnancies were negative.

### MENTAL HEALTH TREATMENT EVIDENCE

**Chris Camplair, Ph.D. - Psychologist**
**Patricia McRae, M.A.  - Psychology Intern - Therapist.**

In March 2004, several months after the birth of her daughter, plaintiff sought mental health treatment from Tualatin Valley Centers for stress, tearfulness, low motivation, erratic moods, irritability, and difficulty getting along with others.

Plaintiff underwent an intake interview during which she was cooperative, friendly, fully oriented, with no impairments in her perceptions, thought process, memory, cognitive functioning, judgment, insight, and abstractions.  During the interview, she was fidgety.  After a restroom break, her speech was pressured, and she had difficulty remaining seated.  She appeared anxious to leave.  Plaintiff described being raised by unreliable parents. While attending trade school, she was found to be using marijuana following a random drug test.  She quit using and finished the schooling.  She continues to use marijuana and alcohol and has taken classes "sometimes" relating to substance abuse.

Plaintiff also described being fired from jobs because she becomes irritated with customers and supervisors.  She has also lost friends because of her irritability.  She stated she was hospitalized once in 1996 for an "infection of the brain."

Therapist Patricia McRrae diagnosed "Adjustment Disorder with Mixed Anxiety and Depressed Mood," with other potential diagnoses of Bipolar I and Substance Abuse.  She described social stressors as including inadequate family and social support, unemployment, and adjustment to life cycle change.  With the help of individual therapy, the goals set for plaintiff included a reduction in plaintiff's depression and anxiety.  Other goals included getting a job and feeling more productive, quitting the use of marijuana, and reducing her alcohol intake.  Dr. Camplair endorsed the diagnoses and goals.

Plaintiff missed five of eight scheduled appointments in the next 10 weeks and then informed Therapist McRae she was "not getting what she wants or needs" from the agency.

**Karen Murphy, FNP, Family Nurse Practitioner.**

Nurse Murphy treated plaintiff for various ailments from March 24, 2004, through June 28, 2004.  Plaintiff was prescribed Wellbutrin and Lexpraxo for depression.

**Sarah Walton, M.Ed., NCC - Mental Health Therapist.**

In December 2004, plaintiff was seen by therapist Sarah Walton at the request of the Department of Health and Human Services.

Plaintiff described suffering from anxiety and mood swings that caused her to be on an emotional roller-coaster.  Her

11 - OPINION AND ORDER

daughter had been removed from her custody because of plaintiff's erratic mood swings and behavior. She admitted to having lied to Child Welfare Services (CWS), but she did not see why her daughter had been removed from the home. Nevertheless, plaintiff was cooperative and friendly. Her speech, thought processes, and content were normal, her affect was appropriate, her mood was unremarkable, and she had no impairment as to her perceptions or memory. Her insight was somewhat limited.

During the next three months, plaintiff continued to smoke marijuana and was not ready to stop. She was stressed, and on one occasion, stopped taking medication. She missed several appointments and a recommendation was made that her treatment be terminated if she did not make contact within 30 days.

**Carla Rajnus, M.A., LMFT - Family Therapist**.

Plaintiff's care was transferred to therapist Carla Rajnus in March 2005. Plaintiff missed the first scheduled appointment and did not call to cancel. When seen two weeks later, she described "feeling stuck and off track."

In mid-April 2005, plaintiff stated she had been fired from a job because of breach of security. She was disappointed and was considering the possibility of leaving the state and moving to California. Two weeks later, she appeared for her counseling session 40 minutes late. She was considering moving to Camas, Washington.

12 - OPINION AND ORDER

## MENTAL HEALTH EXAMINATION EVIDENCE

### Joe Wood, Psy.D. - Psychologist.

In November 2002, Dr. Wood performed a neuropsychological screening examination of plaintiff to determine whether she was suffering from dementia or was malingering.

In a pre-exam interview, she said she used alcohol once in a while and had used marijuana 'a while ago." During the exam, plaintiff was "defensive, belligerent, aggressive, and attempting to be intimidating." She reported being depressed and exhibited a range of affect. She "did not seem to put forth a good effort on the testing." On general intellectual ability, plaintiff showed an IQ range of 56-64, but there were "large discrepancies between the scores that compose either the Verbal scale [67] or the Performance scale [59]." She also scored in the "extremely low range" in other areas.

Dr. Wood noted:

> assessing Keyonna is very difficult because
> of what seems to be a lack of motivation,
> lack of forthrightness, and what seems to be
> exaggeration of symptoms and probably
> malingering.

Tr. 429. Dr. Wood diagnosed "Malingering, Alcohol Abuse by history, R/O Major Depressive Disorder with psychotic features.

### Scott Losk, Ph.D. - Clinical/Neuro-Psychologist.

In September 2004, Dr. Losk performed a comprehensive

psychological evaluation of plaintiff at the request of CWS after plaintiff's daughter was removed from her care.  During the evaluation, plaintiff adamantly denied having any psychological or stress-related problems.  She denied having used alcohol and marijuana within the past five years.  With permission, Dr. Losk talked to plaintiff's mother who said her daughter was in a coma for a month in 1996 because an allergic reaction to medication for a bladder infection.  Plaintiff was unwilling to be forthcoming, making it difficult to reach an opinion regarding her level of functioning.  An MMPI-2 test result was invalid because plaintiff did not see any fault in herself.  Dr. Losk refused to offer any opinion "given [plaintiff's] unwillingness to participate materially in this evaluation."

**Glenna M. Giesick, Ph.D. - Clinical Psychologist.**

In October 2004, Dr. Geisick evaluated plaintiff to determine her ability to care for her daughter.  Plaintiff was cooperative and willing to complete all measures requested of her.  Plaintiff told Dr. Giesick that she considered herself an "accountant" and was working for Verizon in charge of accounts receivable.

During IQ testing, plaintiff was "agitated" and "aggravated" and gave "vaguely snide responses" to questions asked of her.  Dr. Giesick opined plaintiff's IQ range was 81-92, which is at the low end of the average IQ range.  In light of plaintiff's

14 - OPINION AND ORDER

attitude during testing, Dr. Giesick opined the testing reflected a "low estimate" of plaintiff's intellectual functioning.  The MMPI-2 test results were invalid, rendering the other "clinical scales uninterpretable."  Plaintiff had her daughter with her during the evaluation.  The interaction between the two was "uniformly positive."

Dr. Giesick's diagnoses included "Adjustment Disorder with Depressed Mood secondary to losing custody of her daughter." Dr. Giesick assigned a GAF score of 50 (serious impairment in social, occupational, or school functioning).

Dr. Giesick was concerned that plaintiff's erratic behavior needed to be "better understood or explained, addressed, and ameliorated" before she should have sole custody of her daughter. Dr. Giesick questioned whether plaintiff's behavior might be caused by a brain dysfunction and recommended a neurological evaluation and a further drug/alcohol dependence assessment.

## MENTAL HEALTH CONSULTING EVIDENCE

### Frank Lahman, Ph.D - Psychologist.
### Dorothy Anderson, Ph.D. - Psychologist.

Dr. Lahman and Dr. Anderson reviewed plaintiff's medical records.  Dr. Lahman evaluated plaintiff as a malingerer with an adjustment disorder who has a substance abuse impairment. He concluded plaintiff had only mild restrictions in daily living activities, social functioning, and maintain concentration, pace,

and persistence.  Dr. Anderson concurred in that evaluation.

## VOCATIONAL EXPERT (VE) TESTIMONY

VE Gail Young identified plaintiff's past relevant work as including semi-skilled sedentary work as a receptionist, unskilled medium work as a warehouse laborer, medium work as a personal home-care provider, semi-skilled light work as a file clerk and cashier, and semi-skilled heavy work as a construction helper.  The VE opined that someone of plaintiff's age, skills, and experience, who was limited to performing simple tasks without extensive social interaction with co-workers and supervisors, could perform the job of nursery laborer and janitor.  She would not be able to hold any job, however, if she missed three or more days of work per month.

## ANALYSIS

### 1.  Further Development of the Record.

Plaintiff alleges the ALJ should have followed Dr. Giesick's recommendation to further develop the record by ordering a neuropsychological examination to determine the source and scope of plaintiff's erratic behavior and by further evaluating plaintiff's possible drug/alcohol dependency.  I disagree.

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is

inadequate to allow for proper evaluation of the evidence.  <u>Mayes</u>
<u>v. Massinari</u>,276 F.3d 453, 459-60 (9th Cir. 201).


There is nothing ambiguous in the administrative record
relied on by the ALJ in rendering her non-disability opinion
that would warrant further development.  There is no substantial
evidence in the medical records to support any suggestion that
plaintiff's mental status has been adversely affected by a past
brain injury.  Moreover, plaintiff's mental status has been
studied thoroughly by Dr. Wood, Dr. Losk, and Dr. Giesick, and
substantial mental health resources have been made available to
plaintiff, in particular, to help her maintain custody of her
daughter.  Plaintiff, however, has not availed herself of the
opportunities afforded to her.  She did not fully cooperate or
make a significant effort during psychological testing, thereby
rendering the test results invalid.  She repeatedly missed more
appointments for mental health counseling than she attended.
Finally, the record regarding plaintiff's lack of candor
regarding her continued use and abuse of alcohol and marijuana is
overwhelming.

Accordingly, I conclude the ALJ did not err in failing to
further develop the record.

**2.  <u>Plaintiff's Ability to Work Full-Time</u>.**

Plaintiff contends the ALJ failed to assess whether

17 - OPINION AND ORDER

plaintiff was capable of working eight hours a day, five days a week.  I disagree.

The ALJ comprehensively addressed relevant medical records and commented extensively on plaintiff's unwillingness to cooperate with medical practitioners who were endeavoring to determine whether she had significant mental or physical impairments. On this record, I agree with defendant that the ALJ "performed a well-reasoned and detailed assessment of Plaintiff's abilities and limitations."  The ALJ's residual functional capacity finding and hypothetical question to the VE adequately accounted for plaintiff's limitations that were supported by substantial evidence in the record as a whole and the scope of her ability to work on a sustained basis in light of those limitations, i.e., work involving simple tasks without extensive social interaction with co-workers and supervisors.

### 3.  __Functional Analysis of Plaintiff's Past Relevant Work__.

Plaintiff contends the ALJ erred by failing to assess whether plaintiff could perform her past relevant work on a sustained full-time basis, i.e., substantial gainful activity, as required by SSR 82-62, and by failing to include all plaintiff's functional limitations identified by acceptable medical sources as well as non-medical sources such as mental health counselor McCrae, as required by SR 96-8p.  I disagree.

For all the reasons stated above, I find the ALJ fully assessed plaintiff's functional limitations.  The ALJ cited

evidence from acceptable medical sources and other sources, including mental health counselors, in reaching her conclusions. The ALJ plainly articulated reasons why some evidence was more probative than other evidence in that regard.  The workplace limitations found by the ALJ - performance of simple tasks and limited social interaction with co-workers and supervisors - were supported by substantial evidence.

Plaintiff does not point to any specific diagnosis of a medical or mental impairment that the ALJ did not account for in assessing plaintiff's functional limitations.  The evidence regarding plaintiff's ability to sustain work was limited to plaintiff's statement that she had never worked at one place for more than three months.  According to plaintiff, that "indicated the logical likelihood that she cannot now perform sustained work activity."  She also acknowledged, however, that the reason for the short duration of her jobs was her penchant to "jump[] in and out of things," and "get[] irritated with supervisors or customers."  The ALJ, however, adequately took into account the latter personality trait, and the former is a function of plaintiff's choice, not a disability.

**4.  <u>Adequacy of VE Hypothetical</u>**.

For all the reasons stated above, I find the ALJ's hypothetical to the VE was adequate.

## **CONCLUSION**

For these reasons, the Commissioner's final decision denying benefits to plaintiff is **AFFIRMED** and this matter is **DISMISSED** with prejudice.

IT IS SO ORDERED.

DATED this 9  day of February, 2009.


　　　／s／　Malcolm F. Marsh　　　
MALCOLM F. MARSH
United States District Judge

20 - OPINION AND ORDER

21 - OPINION AND ORDER